IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-00328-CMA-STV

MANUEL J. MCGEE,

    Plaintiff,

v.

GABRIEL PACHECO,
PAMELA JONES, and
JEREMY BACA,

    Defendants.
_____

**ORDER**
_____

Magistrate Judge Scott T. Varholak

This matter is before the Court on Plaintiff's Motion for Spoliation (the "Motion"). [#192] The Motion was referred to this Court. [#193] This Court has carefully considered the Motion and related briefing, the case file, and the applicable case law. Neither party requested an evidentiary hearing and the Court has determined that oral argument would not materially assist in the disposition of the Motion. For the following reasons, the Court **GRANTS IN PART** and **DENIES IN PART** the Motion.[1]

---

[1] In considering the Motion, the Court is mindful that Plaintiff is proceeding in this matter pro se. "A pro se litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (citing *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972)). "The *Haines* rule applies to all proceedings involving a pro se litigant." *Id.* at 1110 n.3. The court, however, cannot be a pro se litigant's advocate. *See Yang v. Archuleta*, 525 F.3d 925, 927 n.1 (10th Cir. 2008).

I.  **BACKGROUND FACTS**[2]

This case arises out of an alleged use of excessive force at the San Carlos Correctional Facility ("SCCF") in Colorado. [*See generally* #97] Specifically, Plaintiff alleges that on October 4, 2019, he was suffering from a previously broken right arm that has a six-inch steel plate with six screws. [*Id.* at 4, 8, 10] After Plaintiff got into an argument with two officers in the recreation room and was escorted back to his cell in Unit IR, Plaintiff flooded his cell and made threats of self harm if he was not permitted to see the shift commander. [*Id.* at 8] When Plaintiff spoke with the shift commander, he requested to be moved from Unit IR to Unit 2W to get away from the two officers with whom he had the argument, and the shift commander agreed. [*Id.* at 9]

Plaintiff was then escorted from the Unit IR multipurpose room to the Unit 2W multipurpose room. [*Id.*] Because Plaintiff had made threats of self-harm, Plaintiff was required to speak to a mental health technician. [*Id.*] Pursuant to prison protocol, in order for Plaintiff to speak to a mental health professional, he was required to be placed in universal restraints—chains with handcuffs that attached to the table in the multipurpose room. [*Id.* at 9-10] Plaintiff alleges that Defendant Officer Jeremy Baca placed the universal restraint handcuffs too tightly on Plaintiff's broken right arm and then proceeded to act aggressively, moving very fast and intentionally pulling very hard on the chains. [*Id.* at 10] Plaintiff felt a sharp, piercing pain in his right arm, and

---

[2] The background facts are drawn from the evidence submitted by the parties with their briefing on the Motion and Plaintiff's operative complaint [#97], which Plaintiff attested contained "true and correct" information under penalty of perjury [*id.* at 29]. Although the parties' declarations submitted with the briefing on the Motion contain some factual disputes, because none of the disputed facts is essential to the resolution of the instant Motion, the Court finds it unnecessary to conduct an evidentiary hearing in connection with the Motion.

screamed out in pain for Defendant Baca to both stop and loosen the handcuff. [*Id.* at 10] Plaintiff alleges that he told Defendant Baca that he had a broken right forearm with a steel place and screws and that there was no need for this type of treatment as Plaintiff was not resisting. [*Id.* at 10-11] Plaintiff contends that he pleaded with Defendant Baca to loosen the handcuff on his right arm, but that he refused to respond. [*Id.* at 11]

Plaintiff contends that he also asked Defendant Officer Gabriel Pacheco, who was standing on the right side of Plaintiff at the time, to loosen the right handcuff, but Defendant Pacheco ignored Plaintiff. [*Id.* at 11] According to Plaintiff, Defendant Baca and Defendant Pacheco both gave Plaintiff a "hateful" look and left the 2W multipurpose room. [*Id.* at 11]

Plaintiff contends that he then requested another officer who entered the multipurpose room to loosen the handcuffs, but he too ignored Plaintiff. [*Id.*] Plaintiff then asked a mental health technician and various other officers to get someone from medical to assist him with the pain caused by the handcuffs, but the officers ignored him and no one from medical came. [*Id.*] Plaintiff remained in the universal restraints in the Unit 2W multipurpose room for approximately four or five hours. [*Id.* at 12]

Plaintiff was then moved to a back hallway to be strip searched prior to being placed on a mental health watch. [*Id.*] Defendant Pacheco conducted the strip search. [*Id.*] According to Plaintiff, Defendant Pamela Jones, a nurse, then arrived to do a restraint check per medical protocol to make sure the restraints were not cutting off circulation to Plaintiff's limbs. [*Id.*] Plaintiff contends that, pursuant to that protocol, the nurse is supposed to insert his or her forefinger between the handcuff and the inmate's

3

skin to ensure the handcuffs are not too tight and to request that the officer loosen the handcuffs if they are. [*Id.*] Plaintiff alleges that Defendant Jones failed to conduct a proper restraint check and, even though she was unable to insert her finger between the right handcuff and Plaintiff's forearm, did not request the officer to loosen the handcuffs. [*Id.* at 12-13] Plaintiff contends that Defendant Jones asked Plaintiff whether he had any injuries, and Plaintiff responded that he had a broken right forearm, that the handcuffs were too tight, and that he was feeling numbness in his right arm. [*Id.* at 13] Plaintiff alleges that he told Defendant Jones that Defendant Baca placed the right handcuff too tight around his broken right arm where the steel plate is located. [*Id.*] According to Plaintiff, Defendant Jones acknowledged that Plaintiff's arm was red, but when Plaintiff requested that she have the officer loosen the handcuffs, she too ignored his request and left the hallway. [*Id.*]

On October 9, 2019, Plaintiff filed a step one grievance related to the October 4, 2019 incidents.[3] [#192 at 19] In the grievance, Plaintiff stated that the staff member who had placed the restraints on him was being aggressive, pushed and pulled too hard, and placed the restraints on too tightly. [*Id.*] Plaintiff stated that Defendant Pacheco forced Plaintiff's arm behind his back, because the right handcuff was too tight for Plaintiff to do it himself. [*Id.*] Plaintiff indicated that he asked the staff member, Defendant Pacheco, and Defendant Jones to loosen the cuffs, but they all refused. [*Id.*] Plaintiff stated that he was hurt in the incident, and Defendant Jones refused him a medical emergency. [*Id.*]

---

[3] Plaintiff dated the grievance October 5, 2019, but it indicates that it was received by prison officials on October 9, 2019. [#192 at 19]

4

On October 22, 2019, Plaintiff filed a step two grievance related to the October 4 incident. [*Id.* at 21] Once again, Plaintiff indicated that a staff member had pulled on Plaintiff's arm despite Plaintiff telling the staff member that the restraints were too tight. [*Id.*] Plaintiff stated that he felt a burning pain in his arm from the staff member's actions.[4] [*Id.*]

On November 1, 2019, Plaintiff filed a second step one grievance related to the medical treatment he received in response to the October 4 incidents. [*Id.* at 13] In it, Plaintiff stated that "there [wa]s something wrong with [Plaintiff's] broken right forearm." [*Id.*] Plaintiff further explained that he could not put much weight on his right arm and that he wanted an x-ray to be taken.[5] [*Id.* at 13]

On February 7, 2020, Plaintiff filed the instant action alleging excessive force related to the October 4, 2019 incidents. [#1] On December 10, 2020, Plaintiff filed a motion seeking to compel various items, including video of the alleged incident. [#151; *see also* #154] Defendants responded by indicating that the video of the incident no longer existed because the videos "were not retained in accordance with the Colorado Department of Corrections' ["CDOC"] normal retention policy." [#165 at 1] Based upon the representation that the videos no longer existed, the Court denied the motion to compel to the extent it sought to obtain the videos, but allowed Plaintiff to file a motion for sanctions with respect to the videos. [#189]

---

[4] Plaintiff filed a step three grievance related to the October 4 incident. [*Id.* at 20] As detailed below, however, that grievance was filed after the video recordings at issue in this Motion were destroyed. [*Id.*]

[5] Plaintiff filed related step two and three grievances but those grievances were filed after the videos had been destroyed. [*Id.* at 14-17]

5

On February 10, 2021, Plaintiff filed the instant Motion. [#192] Defendants responded on March 15, 2021. [#205] As part of their response, Defendants submitted an affidavit from Major Dave Allen, an Administrative Services Manager at the SCCF. [#205-1] In the affidavit, Major Allen testified that SCCF has more than 250 NetVu Sprite cameras that cover the facility and approximately 35 hand held cameras that can be checked out to staff to carry on their person. [*Id.* at ¶ 4]

Ceiling cameras from Unit 1 Right—the cameras that would have captured video of the October 4, 2019 incidents—are part of the Sprite system. [*Id.* at ¶ 5] These cameras record video but not audio. [*Id.*] The ceiling cameras from Unit 1 Right are connected to a DVR. [*Id.* at ¶ 7] These recordings are stored for thirty days. [*Id.*] Within this thirty day period, staff can archive the videos. [*Id.*] After the thirty day period, the videos are no longer available. [*Id.*] According to Major Allen, SCCF staff use the hand held cameras to record video during certain operations, including searches. [*Id.* at ¶ 8] The videos from these cameras are not retained after a shift ends unless they are specifically archived. [*Id.*]

SCCF's normal practice is to only archive video where either a use of force or a critical incident such as a crime or incident with significant injuries or property damage has occurred. [*Id.* at ¶ 9] When a correctional officer is involved in a use of force, it is that officer's responsibility to so indicate in an Incident Report submitted to the Shift Commander. [*Id.* at ¶ 10] Based upon his review of the Incident Reports relating to the October 4, 2019 incidents, Major Allen testified that, because "[n]o use of force was involved and [the October 4, 2019 incident] would not otherwise be considered a critical

6

incident[,] [i]t did not . . . meet the standard for archiving video from either the responders' hand-held cameras or the ceiling cameras." [*Id.* at ¶ 11]

After reviewing the Motion and Defendants' response, the Court sua sponte issued an Order requiring Plaintiff to file a reply addressing: 1) when Plaintiff alleges Defendants became aware of Plaintiff's injuries and the possibility of litigation, 2) whether Plaintiff believes the evidence was destroyed intentionally or in bad faith and, if so, what evidence Plaintiff had to support that assertion, and 3) the specific sanctions Plaintiff seeks. [#206] The Court required Plaintiff to submit an affidavit detailing the efforts he undertook prior to litigation to: 1) obtain medical care for his injuries, and 2) pursue an excessive force claim. [*Id.*] In that same Order, the Court ordered Defendants to file a sur-reply addressing: 1) whether the guards' handheld cameras record audio in addition to video, and 2) whether there are any procedures that provide guidance on when staff should report a use of force incident that would trigger the preservation of any video evidence. [*Id.*] The Court further ordered Defendants to submit affidavits from Defendants Baca and Pacheco setting forth when they became aware that Plaintiff contended: 1) he was injured, and 2) that excessive force was used. [*Id.*]

Plaintiff filed his reply on March 26, 2021. [#209] As part of his reply, Plaintiff submitted his own declaration. [#209-1] In it, Plaintiff declares that, upon the right handcuff being placed too tightly over his previously broken right arm, he "immediately complained of pain and informed both [Defendant] Baca and [Defendant] Pacheco and several other officers about [his] pre-existing injury, but was ignored." [*Id.* at ¶ 3] Plaintiff further swears that when a mental health representative arrived, Plaintiff asked

7

the representative to get medical but medical never arrived in the multipurpose room. [*Id.* at ¶ 4] Later, when Defendant Jones conducted a restraint check, Plaintiff informed Defendant Jones of his prior injury and asked her to have the officer loosen his right handcuff. [*Id.* at ¶ 7] Although Defendant Jones allegedly could not insert her forefinger between the cuff and Plaintiff's arm and observed that his arm was red, Defendant Jones refused to have the officer loosen the handcuff and left without addressing Plaintiff's pain. [*Id.*] Plaintiff further testifies that, after Defendant Jones left, Plaintiff told Defendant Pacheco that he was unable to put his right arm behind his back as instructed due to the right handcuff being too tight, but Defendant Pacheco forced his right arm behind his back anyway. [*Id.* at ¶ 8] After being placed in a cell, Plaintiff called the control center and requested a medical emergency. [*Id.* at ¶ 9] Defendant Jones responded, but told Plaintiff that she was "not giving [Plaintiff] a medical emergency for that." [*Id.*] After Plaintiff started kicking his cell door, Defendant Jones returned and again explained that she would not give him a medical emergency and, when Plaintiff demonstrated that he was able to put his arms above his head and out to the sides and front, Defendant Jones denied him pain medication. [*Id.*] Plaintiff testifies that he submitted a medical kite for pain mediation on October 5, 2019, but was not sent to see the nurse practitioner until October 10, 2019. [*Id.* at ¶¶ 10-11] Plaintiff states that he was taken to an outside hospital on November 1, 2019, but the x-ray was normal. [*Id.* at ¶¶ 13-14]

On April 16, 2021, Defendants filed their sur-reply. [#223] In the sur-reply, Defendants acknowledged that the handheld cameras had both audio and video recording. [*Id.* at 1] Defendants further acknowledged that SCCF has policies in place

8

that define a use of force incident that would trigger the preservation of video evidence. [*Id.* at 2] Specifically, a use of force incident is defined as:

> Any incident involving physical force, chemical agents, or lethal force . . . to include all discharges of firearms, except where no offender resistance is encountered in the application of mechanical restraints.

[#223-1 at 3]

Both Defendants Baca and Pacheco submitted affidavits with the sur-reply. [##223-3; 223-4] Defendant Baca testifies that he does not have any recollection of Plaintiff telling Defendant Baca that he had been injured. [#223-4 at ¶ 6] He states that he first learned of these allegations when he was added as a defendant in this lawsuit. [*Id.* at ¶¶ 4-5] He further testifies that he did not prepare a use of force incident report because he did not believe that he had used force as defined by the regulations. [*Id.* at ¶¶ 11-14]

Defendant Pacheco testifies that he recalls that, during the process of restraining Plaintiff, Plaintiff said the handcuffs were too tight, but does not recall Plaintiff saying anything that led Defendant Pacheco to believe that Plaintiff had been injured during their encounter. [#223-3 at ¶ 4] Defendant Pacheco further testifies that he does not recall learning that Plaintiff accused the Defendants of excessive force, that Plaintiff filed a grievance, or that Plaintiff sought medical attention until after this lawsuit was filed. [*Id.* at ¶¶ 4-7] Defendant Pacheco cannot recall why he did not prepare an incident report regarding the October 4, 2019 incidents. [*Id.* at ¶ 9]

## II. ANALYSIS

"Destruction of evidence, or spoliation, is a discovery offense." *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 167 F.R.D. 90, 101 (D. Colo. 1996). Federal Rule of

Civil Procedure 37(e) provides for sanctions when "electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery." "Rule 37(e) does not redefine the duty to preserve; rather it incorporates the common-law duty to preserve relevant information when litigation is reasonably foreseeable." *Bistrian v. Levi*, 448 F.Supp.3d 454, 467-68 (E.D. Pa. 2020) (quotation omitted); *see also Charlestown Capital Advisors, LLC v. Acero Junction, Inc.*, 337 F.R.D. 47, 61 (S.D.N.Y. 2020) ("The duty to preserve [electronically stored information] imposed by Rule 37(e) incorporates the longstanding common law duty."); *Resnik v. Coulson*, No. 17-cv-676(PKC)(SMG), 2019 WL 1434051, at *7 (E.D.N.Y. Mar. 30, 2019) (same).

As part of their common law discovery obligations, "putative litigants have a duty to preserve documents that may be relevant to pending or imminent litigation." *Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 620 (D. Colo. 2007). As explained by one court in this District:

> "Once it is established that a party's duty to preserve has been triggered, the inquiry into whether a party has honored its obligation to preserve evidence turns on reasonableness, which must be considered in the context of whether 'what was done—or not done—was *proportional* to that case and consistent with clearly established applicable standards.'"

*Zbylski v. Douglas Cty. Sch. Dist.*, 154 F. Supp. 3d 1146, 1164 (D. Colo. 2015) (emphasis in original) (quoting *Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598, 613 (S.D. Tex. 2010)).

A court may impose sanctions for the destruction or loss of evidence. *See Cache La Poudre,* 244 F.R.D. at 620; Fed. R. Civ. P. 37(e) (stating that court, "upon finding prejudice to another party from loss of the information [due to a failure to take

reasonable steps to preserve it], may order measures no greater than necessary to cure the prejudice"). "As a general rule, '[s]poliation sanctions are proper when (1) a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of the evidence.'" *Equal Emp. Opportunity Comm'n v. JetStream Ground Servs., Inc.*, 878 F.3d 960, 964 (10th Cir. 2017) (quoting *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1149 (10th Cir. 2009)). The two most important factors in determining spoliation sanctions are culpability of the offending party and actual prejudice to the other party. *See Browder v. City of Albuquerque*, 187 F. Supp. 3d 1288, 1297 (D.N.M. 2016); *HR Tech., Inc. v. Imura Int'l U.S.A., Inc.*, No. 08-2220-JWL, 2010 WL 4792388, at *2 (D. Kan. Nov. 17, 2010). To obtain an adverse inference instruction, the party claiming prejudice must also prove bad faith. *Turner*, 563 F.3d at 1149; Fed. R. Civ. P. 37(e)(2) (stating that, with respect to electronically stored information that was not preserved, court may give adverse inference instruction "only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation").

### A. Whether the Duty to Preserve was Triggered

The first question the Court must answer is whether the duty to preserve was triggered. In making this decision, the Court must determine whether Defendants "knew or should have known that the evidence may be relevant to future litigation." *Zbylski*, 154 F. Supp. 3d at 1162-63; *see also* Fed. R. Civ. P. 37, 2015 Advisory Committee Notes (noting that the rule is based upon the common-law duty for "potential litigants . . . to preserve relevant information when litigation is reasonably foreseeable"). "[W]hile the duty to preserve evidence is often triggered by the filing of a lawsuit . . ., th[e] duty may

11

arise earlier if a party knows or should have known that the material may be relevant to future litigation." *Zbylski*, 154 F. Supp. 3d at 1163 (quotation omitted). Although the analysis focuses on whether litigation was reasonably foreseeable, "courts may . . . consider whether there was an independent requirement that the lost information be preserved" pursuant to "statutes, administrative regulations, an order in another case, or a party's own information-retention protocols." Fed. R. Civ. P. 37, 2015 Advisory Committee Notes. However, "[t]he fact that a party had an independent obligation to preserve information does not necessarily mean that it had such a duty with respect to the litigation, and the fact that the party failed to observe some other preservation obligation does not itself prove that its efforts to preserve were not reasonable with respect to a particular case." *Id.*

"In determining whether a party's duty to preserve has been triggered, courts evaluate facts such as the likelihood that a certain kind of incident will result in litigation; the knowledge of certain employees about threatened litigation based on their participation in the dispute; or notification received from a potential adversary." *Zbylski*, 154 F. Supp. 3d at 1163. Additionally, "[c]ourts have found the duty to preserve to be triggered based on an internal investigation into an incident." *Id.* Ultimately, "a party's duty to preserve arises when it has notice that the [evidence] might be relevant to a reasonably-defined future litigation," *id.*, and "the court's decision must be guided by the facts of each case," *Cache La Poudre Feeds, LLC,* 244 F.R.D. at 621.

Weighing these factors, the Court concludes that Defendants had a duty to preserve video evidence of the incident. At least some of the video of the incident was still available as of November 8, 2019. By that date, Plaintiff had told each of the

Defendants that the cuffs had been applied too tightly over his previously broken right arm, had screamed out for Defendant Baca to both stop and loosen the handcuffs, and told Defendant Pacheco that the handcuff was too tight for him to put his right arm behind his back. [#97 at 10-13; 209-1 at 2-3] He had also filed a grievance in which he stated that the staff member who had placed the restraints on him was being aggressive, pushed and pulled too hard, placed the restraints on too tightly, and refused to loosen the restraints when asked to do so. [#192 at 19] He filed a subsequent grievance in which he stated that something was wrong with his arm and that he needed to have an x-ray taken. [*Id.* at 13] Under these circumstances, the duty to preserve was triggered. *Johns v. Gwinn*, No. 7:18-CV-00150, 2020 WL 7138635, at *7 (W.D. Va. Nov. 30, 2020) (collecting cases for the proposition that "the mere filing of grievances about an issue may trigger the duty to preserve on the part of a correctional facility"); *Lewis v. Erfe*, No. 3:17-CV-01764 (VLB), 2020 WL 4581724, at *3 (D. Conn. Aug. 10, 2020) (finding duty to preserve video triggered where inmate made his complaints about his treatment known during the incident and subsequently submitted a grievance stating that the nurse did not do a proper restraint check, that the restraints were too tight, and that the inmate was seriously injured as a result); *Lewis v. Zatecky*, No. 1:18-cv-00593-RLY-MJD, 2020 WL 9351305, at *1-2 (S.D. Ind. June 2, 2020) (finding duty to preserve is triggered in prisoner litigation cases when the inmate files a grievance with the correctional facility and/or formally submits a request for preservation of evidence to the department of corrections); *Evans v. Gallinger*, No. 18-CV-194-WMC, 2020 WL 1984298, at *1 (W.D. Wis. Apr. 27, 2020) ("[G]iven that inmate complaints are a required first step for inmates to pursue a claim in this court, it makes perfect sense

13

that the inmate complaint would trigger the obligation to preserve any video footage."); *Barnes v. Harling*, 368 F. Supp. 3d 573, 607 (W.D.N.Y. 2019) (collecting cases for the proposition that, "in the correctional context, a duty to preserve may attach when an inmate is in a fight or when an inmate files grievances about the incident").

### B. Actual Prejudice

Having concluded that Defendants had a duty to preserve evidence that was lost or destroyed, the Court must next determine whether Plaintiff was prejudiced by the loss of evidence. "Spoliation sanctions are proper when the court determines that a party had a duty to preserve relevant evidence, and the adverse party was prejudiced by the destruction of the evidence." *Zbylski*, 154 F. Supp. 3d at 1170-71. "The prejudice must be actual, rather than merely theoretical." *Id.* at 1171.

Here, Plaintiff has suffered some prejudice by the destruction of the video evidence. Plaintiff alleges that Defendant Baca placed the handcuffs too tightly on Plaintiff's right arm and then proceeded to act aggressively, moving very fast and intentionally pulling very hard on the chains. [#97 at 10] While the Court has some doubts as to whether the video footage would be able to detect the tightness of the restraints, the video would show whether Defendant Baca was acting aggressively or yanking on the chains and may show Plaintiff's reaction to those movements. Thus, the Court concludes that Plaintiff has been prejudiced by the destruction of the videos.

### C. Sanctions

Because the Court finds that the duty to preserve was triggered and that Plaintiff has suffered prejudice, the Court must determine what sanctions, if any, are appropriate. *See Zbylski*, 154 F. Supp. 3d at 1170-71; *Cache La Poudre*, 244 F.R.D. at

14

621; Fed. R. Civ. P. 37(e). In evaluating the appropriate sanction, the two most important factors are the culpability of the offending party and actual prejudice to the other party. *See Browder*, 187 F. Supp. 3d at 1297; *HR Tech.*, 2010 WL 4792388, at *2.

Plaintiff asks the Court for an adverse jury instruction and the entry of default judgment.[6] [#209 at 8] "The entry of default judgment or the imposition of adverse inferences require a showing of bad faith." *Jones v. Norton*, 809 F.3d 564, 580 (10th Cir. 2015); *see also Turner*, 563 F.3d at 1149; Rule 37(e) (with respect to electronically stored information, court may give adverse inference instruction only "upon finding that the party acted with the intent to deprive another party of the information's use in the litigation"). Here, despite this Court's invitation to Plaintiff to set forth any evidence he had to support his assertion that the videos were destroyed intentionally or in bad faith [#206], Plaintiff failed to present any evidence contradicting the sworn testimony presented by Defendants that the videos were overwritten as part of the jail's standard protocol [#205-1]. Thus, because Plaintiff has not demonstrated bad faith, the Court cannot grant Plaintiff's request for an adverse inference instruction or imposition of default judgment.

While the Court concludes that entry of default judgment or the imposition of adverse inferences is not warranted, the Court notes that Plaintiff has suffered some

---

[6] As indicated earlier, the Court specifically asked Plaintiff to set forth the remedies that he seeks. [#206] In response, Plaintiff cited each subsection of Rule 37(b) and Rule 37(e). Rule 37(b) is inapplicable as Defendants have not violated a court order. [#209 at 7-8] And while Rule 37(e)(1) authorizes the Court to "order measures no greater than necessary to cure the prejudice," beyond his request for default judgment or an adverse instruction, Plaintiff does not cite to any specific measures that could cure the prejudice in this case [*see generally* #209].

15

prejudice and, as a result, some sanction may be appropriate. The Court concludes that it may be appropriate to allow Plaintiff to present evidence at trial about the failure to preserve the videos. *See Hatfield v. Wal-Mart Stores, Inc.*, 335 F. App'x 796, 804 (10th Cir. 2009) (affirming district court's decision in slip and fall case: (1) allowing plaintiff to present evidence regarding the unavailability of store surveillance video, though video from the date in question did not show the actual fall, but (2) refusing to impose adverse inference or other instruction); *Session v. Romero*, No. 14-cv-02406-PAB-KLM, 2019 WL 324777, at *1, 5 (D. Colo. Jan. 25, 2019) (allowing parties at trial to present evidence regarding the destruction of certain evidence and to argue whatever inferences the parties hope the jury would draw from the absence of that evidence where plaintiff demonstrated spoliation of evidence but not bad faith). Ultimately, however, the Court believes that issues of the relevance of this evidence and the appropriateness of arguing for inferences therefrom should be determined by United States District Court Judge Christine M. Arguello, the presiding district court judge, once she has had the opportunity to hear the other evidence that has been presented. Plaintiff may include any proposed evidence about the destruction of the videos in the proposed Final Pretrial Order, and the parties may raise the relevance issue with Judge Arguello at the Trial Preparation Conference.

Thus, for the reasons stated above, it is **ORDERED** that Plaintiff's Motion [#192] is **GRANTED** to the extent it seeks a finding of spoliation and prejudice from that spoliation but **DENIED** to the extent it seeks entry of default judgment or the imposition of an adverse inference. At the Trial Preparation Conference, Plaintiff

may raise the issue of introducing evidence about the destruction of the videos during the trial and arguing appropriate inferences from that destruction.

DATED: May 25, 2021                                   BY THE COURT:

                                                     s/Scott T. Varholak
                                                     United States Magistrate Judge